13-1404 GUANGDONG WIREKING HOUSEWARES v. United States Thank you, Your Honor. The 2012 law at issue in this case, particularly when viewed with the perspective of the guidance from Selling v. Young, which the Court brought to the party's attention yesterday, is unconstitutional. As Selling requires, we begin with the text of the law. The asymmetrical effective dates in this law create a penalty. Well, let me tell you one problem that I have, and that is you rely very heavily on our decision in Huaying. And that case doesn't cite, I think, any of the long line of ex post facto cases decided by the Supreme Court or the seven-factor test that the Supreme Court adopted in Mendoza-Martinez and was referenced in Selling and other cases. So it seems to me that it's difficult to read Huaying as creating a three-part test, which displaces the Supreme Court's seven-part test. And should we be reading Huaying as superseding the Supreme Court in that respect? Your Honor, we turned to Huaying for several reasons. First, it was a decision by this Court. No, but try to answer my question. I mean, it sets forth a three-part test, which is quite different from the Supreme Court's seven-part test. Yes, Your Honor, and the reason why, in our view, it is a relevant standard is it is a standard specifically crafted to deal with the situation presented by trade remedy laws, which is a unique context. The Supreme Court has never had the occasion to decide when is something a penalty or not a penalty in the context of the trade remedy laws. So why does that suggest that the Supreme Court's test should be inapplicable in that context? Because it's a more tailored test, Your Honor. It's a test that is crafted to specifically ask the question, when is something a penalty for purposes of the trade remedy law? The Supreme Court has crafted a more general standard to apply to a wide variety of situations, which isn't as precisely tailored as the Huaying test in this particular case. But ultimately, Your Honor, whether you're using the test from Huaying or the multi-factor test from the Supreme Court standard, it ultimately comes down to the same question. Is there a penalty being imposed on a retroactive basis? Because if the statute that we're attacking goes from being a merely civil, from merely a remedial statute, if it imposes a penalty, we're in a very special situation because it's being imposed retroactively. But I'm having difficulty in seeing how you can satisfy the seven-part test of Mendoza-Martinez and Doe and these other cases, which says, first of all, you ask whether it was – the intent was civil, which overall statute the intent was civil, correct? Yes. And in this case, Your Honor, it is – what we have is the statute and the terms of the statute. We do not have the benefit of much legislative history because Congress was rushing to legislate in this case. We essentially have the words of the statute and we have roughly 30 minutes of floor debate. And that's basically the universe that we're dealing with. But as selling requires and as the Kennedy-Martinez factors require, we start with the text of the statute. And what does the statute provide? Prospectively, the statute says that you can impose a countervailing duty against a non-market economy, but only if you make an offset for any demonstrated double counting. So on a prospective basis, we have a system where you're imposing an additional duty, but then you're lowering the other companion duty. And that becomes, for purposes of the trade remedy law, the new benchmark for determining whether it's remedial or not. The remedy is – basically, the remedy is either under the old law, special anti-dumping duties for non-market economies. Or under the new law, it's imposing a countervailing duty, but then adjusting the already imposed remedy for non-market economies under the anti-dumping law. So you have those two alternatives. What if the law hadn't done that prospectively? Would there be a problem with the prospective aspect of the law too? But for the asymmetrical effective dates, there would not be a problem because there would be no penalty. If Congress had said, prospectively, we're going to make these changes and we're not going to impose any change retroactively, we're going to allow prior law to stand, as construed by this court in Georgetown Steel and in the GPX decision. My question is if the law had been written so that what you call double counting happened both retroactively and prospectively, would you have a problem with that law? If the adjustment for the double counting applied retroactively, no, Your Honor, we would not have a problem with the law. Our problem with the law – I think the question, if I understand it, is suppose there were no double counting exception at all in the law and that it simply said that for non-market economy countries that both countervailing duties and anti-dumping duties are going to be imposed. Now, would that be punitive? Your Honor, that probably would not be punitive, Your Honor, because it would be applied on a symmetrical basis. The crux of our problem with the law is that having decided that for the trade remedies to be remedial, having decided for policy reasons because of the WTO decision, having decided that the outer limit of the remedial trade remedy law is countervailing duties plus lower special anti-dumping duties, having given us that test, that benchmark, that statutory guidance for the outer limits of the remedy, when you then go back and impose a countervailing duty with no adjustment, you've gone beyond the remedial purpose. That's what creates the penalty. But that presupposes that the law before this amendment didn't allow for a countervailing duty with no adjustment. That is correct, Your Honor, which is what has been – Lastly, we conclude that the statute prior to enactment of the new legislation did not impose a restriction on commerce's imposition of countervailing duties on goods imported by non-market economy countries to account for double counting. We specifically made that finding. There was a finding about the ability or inability to adjust for double counting that did not address the question of whether countervailing duty laws in the first instance could have been imposed. But as I understand it, you're conceding that the prior law, which made no adjustment for double counting, was not in violation of the ex post facto clause. Because prior law did not allow the imposition of a countervailing duty. Prior law did not allow any imposition. I thought you also conceded that if the law were amended and didn't give any double counting protection for anybody, that that would not be a violation of the ex post facto clause. That's because that would not involve a penalty. That would not – Why is it a penalty if there's relief for somebody but not other people when it wouldn't be a penalty if they were both subject to a regime which didn't take account of double counting? It's a penalty, Your Honor, because it's going beyond the remedial purpose of the statute. If Congress has discretion prospectively to calibrate the trade remedy laws, we're not challenging that. On a prospective basis, Congress has wide discretion. Our objection is that when Congress tries to legislate retroactively, it faces a different set of constraints. It's no longer in the realm of broad discretion in economic policymaking. It has to comply with the additional requirements of the constitutional limitation against imposing penalties, punitive measures on a retroactive basis. I'm still confused with your response to my earlier question. If we said that there was no restriction on Congress's ability to impose countervailing duties without doing a double counting adjustment, you're saying that that doesn't also include the conclusion that there was no restriction on the ability to – Yes, Your Honor, that is exactly what I'm saying because that is precisely what this court found in GPX, the December 2011 decision. Right, but the 2012 decision is a new decision. But it did not change the fundamental basis of GPX 2011. In fact, to the contrary, Your Honor, the May 2012 decision, notwithstanding a request from the government to basically say, please vacate your December decision because the law has changed and Congress has now clarified what it had earlier meant, this court consciously did not vacate the December 2011 decision. The December 2011 decision stands as good law as a correct interpretation of what the prior statute provided. But that's not what we said in 2012. In fact, in addition to what I've just read in footnote three, we said that the Court of International Trade had previously found that Congress's imposition of both countervailing duties and anti-dumping duties under the preexisting law amounted to unreasonable double counting. The new legislation makes clear that this theory was not correct, meaning it was not correct back then. Right. That's the issue of double counting, Your Honor. That's not the core question of whether the statute prior to the amendment allowed for the imposition of countervailing duty laws. Why would we say that the theory about – I mean, the whole reason that they were saying you couldn't do both was because of the double counting problem. We're saying there wasn't – we now know there was no double counting problem. Actually, with all due respect, Your Honor, I don't think that was the essence of the court's decision in December 2011. The court's decision in 2011 was not at all grounded in the double counting rationale. The court had, in fact, not followed the path that the CIT had. And I think the language you're citing in the May 2012 decision was simply the court trying to clarify the relationship of its finding about the scope of the statute under the old law with the rationale, the alternative rationale that the court had not pursued but that the Court of International Trade had. I'm happy to answer any other immediate questions. I'm still having trouble understanding why, if the law was constitutional without the double counting relief, why giving double counting relief to some parties but not to others makes it an ex post facto law. The reason, Your Honor, is that the test for ex post facto is does the statute impose a penalty? And to say that the full remedial effect – How does it make it a penalty to give relief to some people from double counting but not to others? The penalty, Your Honor, is that higher duties are being imposed. It's analogous – there aren't that many ex post facto cases, but it's analogous to the situation in Salmon v. Burgess where the Supreme Court invalidated a retroactive tax that imposed an additional pennies on the pound on tobacco. There was no question that prospectively Congress could raise the tax on tobacco. But when changing the law retroactively, the constitutional provision – That's not addressing the question. There isn't any case like this where giving relief to some parties but not to others renders the statute an ex post facto statute when it wasn't before. Because I wouldn't characterize it as giving a relief, Your Honor. I would characterize it as Congress in the statute defining what is remedial. It's not Congress sort of giving some party a benefit and then not giving another party a benefit. Congress is saying for the future, prospectively, this is what a remedy represents. This is all you're entitled to as a remedy. You're not entitled to more. And so when you then retroactively do more than that, you've gone beyond the remedial purpose of the law, and in our view, you've imposed a penalty. With that, I'll save the remainder of my time for a quick rebuttal. Thank you. Mr. Serdlov, is that the way you pronounce it? Yes, it is, Your Honor. Good morning, Your Honors. May it please the Court. I think before we get to the question of whether the law is subject to restrictions of the ex post facto clause, we first have to answer the question whether it meets the preconditions, namely whether it is a retroactive law. Now, as we detailed in our brief— It sounds as though you're trying to re-argue what we decided in GPX. Absolutely not, Your Honor. We absolutely are not trying to re-argue GPX. All we're trying to say is that before this legislation passed, there was an uninterrupted chain of agency practice. GPX would have interrupted that chain had it become final, but it never became final. So what we had is we had an uninterrupted chain of agency practice, which under Supreme Court precedent in Brand X is the binding construction of the law. GPX1 never rose to the level of displacing that agency construction because it never became final. And then the statute merely confirmed what Commerce had been doing. So to agree with you, we would have to basically repudiate all the reasoning in that 2011 GPX opinion. Is that fair to say? No, I don't think so, Your Honor. Again, I think to agree with us, the court would simply have to follow Brand X and to look at—not look behind the scenes at congressional action and— The 2011 decision, though, discussed Brand X and explained, at least in that opinion, why Brand X doesn't control or apply, right? Yes, it did, Your Honor. So then you're asking us to basically disagree with at least that portion of the 2011 opinion? In a very limited and superficial way, Your Honor. All we're asking the court to do— You're being superficial in the opinion that's being superficial. No, we're being superficial. I apologize, Your Honor. I misspoke. What we're asking the court to do is to look at the situation on the ground, at what was happening. Between 2006 when Commerce determined that it could start identifying countervailable subsidies in China, in non-market economies like China, and so from 2006 until the new legislation was passed. And during that period— We decided in GPX that Congress could change the law and left open the question of whether it could change it retroactively. That was the purpose of the remand. That's a decision that there was a change in the law, and the question was whether it could be validly done retroactively. And that's what we left open. I don't see how you can interpret it otherwise. If the court is talking about the second GPX opinion, the remand opinion— Yeah, we said Congress has changed the law, we're bound by it, and the question is whether it's lawful to do it retroactively. We assumed that it was a change in the law which was retroactive. We've decided that, no? Your Honor, respectfully, I don't think this court did decide that. This court remanded GPX—remanded that case for the trial court to answer the question whether the asymmetrical effective dates created any sort of constitutional problem of the type of equal protection and due process challenges that WireKing raised below and apparently did not raise in its opening brief and is now trying to reanimate. But the court never actually—the court's opinion does not say one way or another, and it wasn't—it is—the court's opinion does not say one way or another whether the first section of the law actually changed what the state of the law was. Why don't you address the other point? Certainly, Your Honor. And I've got to say as to the other point as to whether this is punishment within the meaning of the ex post facto clause, I find it rather surprising that the government did not address the line of Supreme Court cases beginning with Mendoza-Martinez, which I think is not even cited in your briefs. You know, why is that? Why didn't you address for us the governing law from the Supreme Court as to what's ex post facto? Because, Your Honor, we saw that we were bound by Huayen. Does Huayen reject the seven-part test in the Supreme Court? Your Honor, I don't think— Does it? No. No, I don't think it does. I think that it is not—given that Huayen is binding precedent from this circuit— Huayen does not say that the three-part test is the exclusive test, does it? No, it does not. But it does set up, as Huayen pointed out, Huayen does use the test, use the three-part test in the context of trade remedies. And the reason we addressed their argument head-on without venturing into whether there is any conflict or tension between Huayen and the line of Supreme Court cases is because even under Huayen, their argument fails. They can't make a showing that this is a punitive law. In the reply brief and now before the court, Wierking is altering its argument somewhat, and it's saying that it's the asymmetrical effective dates, the fact that the double-counting offset only applies prospectively but not retrospectively. That's what gives cause to the violation. At the trial court below, they styled that as their due process and equal protection challenge. And they, in fact, didn't put that in their opening brief. They only brought it up in their reply, which is why we didn't respond to it in our brief. But the answer to that argument is, first of all, the reason that Section 2 is in the act is because Congress was acting to bring the United States into compliance with its international trade obligations, responding to a WTO panel decision. That type of action, bringing the United States into compliance with its international obligations, is prospective only. And to use the international standard of what constitutes fair trade under the WTO regime as somehow casting insight into what the constitutional standard is for what is a punitive duty is entirely inappropriate. Congress saw that prospectively, following a WTO panel report, the United States had an international obligation to investigate double-counting. By the way, the statute never says you will automatically offset for double-counting. All it says is the parties basically shall be given an opportunity to present evidence, and if they make a showing, then we'll make an adjustment in that case. But to now say that that's the new baseline and anything that exceeds that baseline is punitive is simply incorrect because it confuses those two standards. And it's also incorrect because it misreads the plain language of Huaiyin. Huaiyin says something is punitive if there's an absence of an association between the remedy and the harm, if the costs imposed are unrelated to the harm. Without going through in detail all the ways in which double-counting does not automatically occur, certainly in this case, there's no evidence that double-counting actually occurred. It's speculative. But even if it did occur, there would still be an association. The trial court correctly noted that even if double-counting exists, then there's still a mathematical link between the duty and the benefit that commerce calculates. So I think it— I don't understand that. I mean, if it's double-counting in that iteration, it's not remedial, is it? It is remedial, Your Honor. Congress could come in and— How so? Well, if I may step back, I think one way to look at it is to clarify what is the harm that we're talking about and what is the remedy, what is the scheme, right? Duties remedy harm that's caused from anti-competitive behavior. But when harm—harm is never quantified in a dollar amount. The harm to the domestic industry is a binary determination. The ITC makes a determination. The International Trade Commission makes a determination. Is there injury or threat of injury to the domestic industry? That's the harm. The harm is either there is threat of injury or there's no threat of injury. It's not like the ITC goes out and says the harm is 10 percent, the harm is $20 million. So the harm is basically an abstraction of some sort. It's a binary finding. Now, the remedy that's imposed is a calculation of the benefit, the unfair benefit that the respondent receives. And under Hawaiian, all it has to be is it has to be proportional. So even if the duty is two times the amount that commerce identified in the subsidy, that's still proportional. It's still a mathematical link. It's still a relationship. But it's not a categorical reflection of you are an importer. You import goods from China. We automatically slap a tariff on you. Okay. Do you want to save some time here for your co-counsel? I absolutely, Your Honor. Judge, I expect not to respond. Oh, I see. Sorry. Okay. You have a minute left. If the Court has no further questions. Just a curiosity. You said the WTO put this obligation on us to check for double counting. And why didn't that or Congress believe that that also applied retroactively? For several reasons, Your Honor. First of all, the most important reason is that WTO bringing the United States into compliance with its international obligations can only happen prospectively. For example, like Section 129 determinations. It is essentially under the statute and its policy that bringing the United States into compliance with adverse findings by WTO panel will happen prospectively. So Section 2 simply reflects that practice. And I think the other reason, a very important reason that the trial court recognized, which, again, we didn't get a chance to discuss it because Warren King didn't raise it in its opening brief. But the trial court recognized that, as we argued to the trial court and it recognized, Congress had a rational basis for not making the adjustment retrospective. And that was administrative finality and efficiency. This is found on the trial court's decision. The site is 900 F sub to the 1373 to 75. And basically the trial court goes and it agrees with our reasoning that under Supreme Court precedent, a decision to not make an administrative agency reopen its concluded determinations constitutes a rational basis for making essentially an asymmetrical adjustment. These determinations aren't final. I mean the GPX determination, for example, is not final. Let me reopen the final determination. Your Honor, the GPX determination certainly is not final. But as the trial court noted, there are 24. There were 24 determinations, investigations, and proceedings that took place during this period between 2006 and when the act was passed. And the question was, was it rational for Congress to conclude that commerce should not be required? What about the ones that weren't final? What about GPX? Your Honor, GPX wasn't final because it had been litigated. Well, it wasn't final, so? GPX itself wasn't final, Your Honor. What's the basis for not applying the double-counting relief to GPX? Your Honor, I think the question before Congress – or really the question that the trial court was trying to answer was whether Congress had a rational basis. And the question is not – What's the rational basis for not giving double-counting relief to GPX? Because GPX was – even though the GPX determination was not final, there were a number of other determinations that were final. And if Congress were to give relief to – That makes no sense. Because some were final and we reopened them, they didn't want to give relief to the ones that weren't final? I think because some were final, Congress had a rational basis for not imposing an additional administrative burden on commerce to go back and investigate these things, create a whole new record, or at least an extensive supplementation to the record regarding what amount of double-counting occurred or didn't occur. And in Armour v. City of Indianapolis that we said before the trial court and the trial court cited in its opinion, the Supreme Court found that that kind of interest in administrative efficiency is a rational basis to create – to give relief to people going forward. But it has nothing to do with the ones that weren't final. It may be a perfectly good justification for not reopening the ones that were final. It is not a justification at all for not reopening – for not applying it to the ones that weren't final. No? I think the question that the court – again, the question before the trial court and the question that the trial court was trying to answer is whether the act reflects a rational basis. And was there a better way that Congress could have done it? Maybe. But the question is, was what Congress did supported by a rational basis? And so categorizing – was categorizing GPX the way that Congress did rational? And the answer is certainly yes. Okay. Thank you. Thank you, Your Honor. Mr. Rosenthal, we'll give you your three minutes. Thank you. Okay. Please, the Court. Paul Rosenthal for the domestic industry. I want to quickly address the first issue raised by Judge Schen – Judge Dyke about the retroactivity and what the May 12th decision by this court said there. Because I don't think you have to redo everything that the court had said in the – in the December 11th. We're not trying to undo everything. But what the court said – and this is maybe the confusing part here – is the Supreme Court has counseled that when a new law makes it clear that it is retroactive, an appellate court must still apply the law in reviewing judgments still on appeal that were rendered before the law was enacted and must alter the outcome accordingly. This case was still pending on appeal when the – when Congress enacted the new legislation as our mandate had not yet issued. An appellate court's decision is not final until the mandate issues. So the question before this court was, without a final decision, if GPX 2011 was not final, as this court seemed to suggest in the May 12th decision, is there really retroactivity? That is why I don't think it's a stretch to suggest that there's no change in the law because GPX 1 was never finalized because the mandate here never issued. That's the argument that we're making. But I want to – if it's permissible, I'd like to move on to the – As I read the 2012 decision, ex post facto was not an argument that was raised. There were constitutional arguments raised, but they seemed to relate to either equal protection, due process, or bill of attainder problems, correct? I believe so. And I think the court basically said, look, we're not going to address this now. These have been raised in a letter brief of five pages. We want to have the lower court look at this because there are issues of first impression, and you quite appropriately referred it down to the lower court. But what you did say was that because the mandate hasn't issued, this judgment is not final, which leads to the conclusion heard by the government and by the interveners here that there was no change in the law as a result of the non-final decision because the mandate didn't issue. I want to go – well, if there had been a change in the law with respect to a final decision, you'd have a serious problem of separation of powers. Congress can't do that, right? Yes. And that's why you addressed that in your May 12 decision, May 2012 decision, and appropriately said there is no problem there. But I, and I think most other people reading the opinion, also took that section to mean that this was not a final judgment, which meant that the decision of December 2011 did not change the law because the decision wasn't final. So that's why I don't believe you even need to address the ex post facto part because of a lack of retroactivity. But let me address ex post facto very quickly. I think that you need to go back to your initial questions to Mr. Durling. He conceded that if the law did not – I'll have this exact quote here, but he admitted that the imposition of duties without a double counting adjustment was not unconstitutional. And then there was a discussion, well, let's say Congress decides that it's going to give a tax benefit to people starting on January 1, 2014. And if you are alive on that date, you get 20% reduction in taxes. It doesn't make it penal for the people who didn't get that tax break in 2013 or the years before. Just because you're providing a benefit in the future doesn't make the failure to provide that benefit going backward penal. That's an important point to make, and I think it was conceded by Mr. Durling. Okay. Thank you, Mr. Rosenthal. Thank you. I'd just like to clarify a few points. First, this case is also not final. In fact, many of the countervailing duty cases at issue were not final. It's not just about GPX. Second, I would just like to emphasize that when specifically asked to do so, the court did not withdraw, did not in any way change its December 2011 GPX decision. I think that is still an accurate statement of what the old law provided. The third point I'd like to clarify is that while I recognize Wai-Yin did not set forth an exclusive test and on its face did not attempt to supplant alternative tests, I would note for the court that the Wai-Yin test ultimately itself derived from Supreme Court precedent. Wai-Yin was based on NGOLES. NGOLES, a decision by this court, was based on Huntington v. Attrell, which is 146 U.S. 657. Yes, but neither of those two cases was an ex post facto case. That's correct, Your Honor. But when applying the test in the context of Wai-Yin, it was applying it for purposes of the constitutional analysis and was adapting it to the specific context of when can we think of something as being a penalty in the context of trade remedies. So I agree it's not the exclusive way to analyze it, but we believe it's an appropriate way to analyze the case. The next point I would like to emphasize is that one of the other points of guidance from Selling is that the constitutional analysis is not about measuring the effect. The point of the constitutional analysis is, is the statute on its face punitive or not? And whether you use the Kennedy-Martinez factors or the Wai-Yin factors, if the court concludes that the statute on its face imposes a penalty, that triggers the constitutional prohibition that we've raised in our case. So it's not about the magnitude of the effect. You don't get to impose unconstitutional laws if they have small effects. That's not the way the ex post facto jurisprudence works. If a law is ex post facto, if it rises to the level of a penalty, then the law is not allowed. And it doesn't matter. Thank you, Mr. Gerwin. I think we're out of time. We thank both counsel. The case is submitted.